# UNITED STATES DISTRICT COURT
for the
Middle District of North Carolina

| | |
|---|---|
| United States of America<br>v.<br>Deshawn Lemar Sloan<br><br>*Defendant(s)* | )<br>)<br>) Case No.<br>)    1:22MJ 483<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __10/26/2022__ in the county of __Forsyth__ in the __Middle__ District of __North Carolina__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(d)(1) | Transfer of a firearm to a prohibited person |

This criminal complaint is based on these facts:
See Affidavit

☑ Continued on the attached sheet.

/S/ RUSSELL JOHNSON
*Complainant's signature*

Russell Johnson, Special Agent, ATF
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Criminal Complaint and attached affidavit in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: 12/08/22

City and state: Greensboro, North Carolina

*Judge's signature*

L. Patrick Auld, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT OF SPECIAL AGENT RUSSELL JOHNSON
# IN SUPPORT OF APPLICATION FOR ARREST WARRANT

I, Russell Johnson, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, being duly sworn, state as follows:

## AFFIANT'S EXPERIENCE

1. I am an investigative or law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7) and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2. As a law enforcement officer, I have used and/or participated in a variety of methods investigating firearms and narcotics related crimes, including, but not limited to, visual surveillance, witness interviews, the use of search warrants, confidential informants, undercover agents, pen registers/trap and trace devices, and mobile tracking devices. Based upon information gained through this investigation and others pertaining to firearm trafficking activities of the participant in this investigation, I am familiar with the ways firearm traffickers conduct their business. My familiarity includes the various means and methods by which firearm traffickers acquire and distribute their firearms, their use of cellular telephones, and their use of vehicles in furtherance of firearms trafficking and money transactions.

## PURPOSE OF AFFIDAVIT

3. This affidavit is made in support of an application for a criminal complaint for Deshawn Lemar Sloan.

4. I have probable cause to believe that Sloan did knowingly transfer the following firearms, Kahr Arms, model CW40, .40 caliber pistol, serial number FE5266, with prior knowledge that the Confidential Informant was a prohibited person, specifically a convicted felon, in violation of 18 U.S.C. § 922(d)(1).

## THE INVESTIGATION – FACTUAL BACKGROUND

5. Because this affidavit is being submitted for the limited purpose of establishing probable cause for a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause of violation of federal criminal offense, specifically 18 U.S.C. § 922(d)(1).

## PROBABLE CAUSE

6. On October 26, 2022, an ATF Confidential Informant[1] (hereinafter, CI) was debriefed by Agents and stated that they met an individual on October 14, 2022, who had approached them at a hotel and introduced himself as

---

[1] The CI was compensated by ATF for his/her services and has a history of criminal convictions including at least one felony conviction.

2

"Draco." "Draco" provided his phone number to the CI as XXX-XXX-0154. Between October 14, 2022 and October 26, 2022, the CI and Sloan discussed firearms and Sloan's ability to acquire a firearm on behalf of the CI. Research by ATF showed Sloan to have applied for and received at least nine (9) different gun permits, allowing him to purchase at least that many handguns from Federal Firearm Licensees (hereinafter, FFL).

7. On October 26, 2022, at approximately 12:52 p.m., Sloan began sending the CI photos of displayed firearms that appeared to be sent from an FFL. Based on the pictures, the CI informed Sloan that they wanted the Kahr firearm, which Sloan replied was a .40 caliber firearm. The CI asked Sloan if he was in the store currently while they were texting, and Sloan stated that he had just left and instructed the CI to met up with him so he could get the money to purchase the firearm. While communicating where they should meet, Sloan told the CI that the Kahr, .40 caliber firearm would cost $379 with tax.

8. On this same date, the CI and Sloan met in the Walmart parking lot, 3475 Parkway Village Circle, Winston-Salem, North Carolina. Once Sloan observed the CI's vehicle (hereinafter, CIV), Sloan exited his vehicle and entered the front passenger seat of the CIV. The CI immediately informed Sloan, "I didn't wanna go to that mother fuckin pawn shop, I'm a felon." The CI then asked Sloan how much money he wanted, and Sloan instructed the CI to provide him with $500, which the CI did. Sloan detailed to the CI that the

3

FFL would run his (Sloan) identification and once it came back, he would get the firearm. Prior to separating from the CI, Sloan confirmed the CI wanted the "Kahr Arms," which the CI confirmed. Sloan departed the location in his vehicle.

9. Minutes after departing the Walmart parking lot, ATF surveillance observed Sloan arrive at an FFL and enter the FFL. While inside the FFL, a covert ATF Agent heard Sloan state to the FFL employee, "I have bought so many guns from him." When describing a prior incident, he was involved in, Sloan told the employee, "I'm just gonna load up on pistols." After completing the paperwork for the Kahr Arms that he purchased for the CI, Sloan was heard telling the employee, "I'll be back to get another one, I got 3 more permits, I try to go gun shopping every week, I just bought myself a safe, I bought my wife a compact 9. I'll be back, I got like 3 or 4 more left, I usually just rack up and I go get like 10 permits at a time." Sloan was observed exiting the store, carrying a firearm box, and then reentering his vehicle. ATF Agents surveilled Sloan back to the Walmart parking lot.

10. Once in the Walmart parking lot, Sloan reentered the CIV. Sloan immediately handed the CI the Kahr Arms firearm box, which contained a Kahr Arms, model CW40, .40 caliber pistol, serial number FE5266 and told the CI, "Look at that." The CI, along with the original $500 previously provided, handed Sloan an additional $100 for completing the purchase. The CI told

4

Sloan that they were going to purchase a "throwaway phone" because "as a felon, I can't even have them motherfuckin pictures," referring to all of the pictures of firearms that loan had previously sent the CI. Sloan instructed the CI to scratch the serial number off the Kahr Arms and for the CI to let Sloan know when that was done so Sloan would not have to worry about it.

11. The transaction was audio/video recorded and the funds used for the purchase were prerecorded.

12. On October 30, 2022, Sloan asked the CI if they had obliterated the serial number off of the Kahr Arms pistol Sloan sold the CI on October 26, 2022. The CI stated they had not; however, their associate and their brother were both interested in acquiring firearms. Sloan agreed to meet with the CI on November 1, 2022, to conduct the transaction.

13. On November 1, 2022, the CI, accompanied by an ATF Special Agent (hereinafter, UC), acting in an undercover capacity, met with Sloan in the Walmart parking lot, 3475 Parkway Village Circle, Winston-Salem, North Carolina to conduct the firearms transaction. UC asked Sloan what other options the FFL has if they are out of Glocks. Sloan stated he had not been back inside the store since he purchased the firearm on behalf of the CI. Sloan estimated that he could find something at a similar price to the Kahr Arms that he had purchased previously for the CI. The CI asked Sloan if the "Tec" style firearm that Sloan had sent pictures of on October 26, 2022, was

5

considered a "long gun." Sloan stated that it was considered a rifle and that he would not have to use a gun permit for the purchase. UC asked Sloan if $1,400 was enough to cover the handgun for UC and the "Tec" for the CI, which Sloan acknowledged that it should be. UC provided Sloan with $1,000 and the CI provided Sloan with $400.

14. Sloan told UC and the CI that he would send pictures of firearms once inside the store. Sloan told UC that he had sold a shotgun to a couple males and referenced reporting the firearm stolen. UC understood Sloan to be expressing a method to avoid detection by law enforcement of illegal transfer of firearms. UC informed Sloan that he (UC) would obliterate the serial numbers and Sloan replied that if UC did that, Sloan would wait a month or two (2) to report the firearms he was about to purchase stolen.

15. Sloan departed the location and was surveilled by ATF Agents entering an FFL. While Sloan was in the store, he sent the CI several pictures of displayed firearms. UC and the CI informed Sloan to acquire them the Glock, model 44 and the "Tec" firearm. After receiving the firearms, Sloan called the CI and stated he was in route back to the Walmart parking lot. Sloan told the CI that he had to use a gun permit on the "Tec." Sloan stated that if he had his concealed carry permit, he would not have to use gun permits. The CI told Sloan, "If I didn't have a record," the CI would purchase the firearms themselves.

6

16. Once Sloan returned, he handed UC a box through the open driver side window of the UCV. UC observed a Glock firearm box and the Tec style firearm, further described as a Glock, model 44, .22LR caliber pistol, serial number AEML705 and an AA Arms, model AP9, 9mm pistol, serial number 005425 (Tec style firearm). UC retrieved the Glock firearm box, and the CI retrieved the Tec style firearm. Sloan entered the rear driver seat of the UCV. The CI provided Sloan with $400 for making the purchase, $200 for each firearm.

17. Agents initially identified Sloan through the cellular phone he used, as he maintained service in his own name. The UC and the CI were also shown a North Carolina driver's license photo for the individual involved in the undercover transactions described above and from such driver's license photo both the UC and the CI identified the person as Deshawn Lemar Sloan.

18. The transaction was audio/video recorded and the funds used for the purchase were prerecorded.

## INTERSTATE NEXUS

19. A qualified ATF nexus examiner determined that the Kahr Arms, model CW40, .40 caliber pistol, serial number FE5266 travelled in interstate commerce prior to arrival in North Carolina.

7

## FELONY CONVICTION STATUS

20. The Confidential Informant has a qualifying felony conviction for which he/she received a sentence in excess of one year in prison, such sentence has not been set aside nor has he/she been pardoned.

## CONCLUSION

21. Based on the foregoing facts and circumstances, I respectfully submit that there is probable cause to believe that on October 26, 2022 within the Middle District of North Carolina, Deshawn Lemar Sloan committed the following criminal offense: knowingly transfer the following firearm, Kahr Arms, model CW40, .40 caliber pistol, serial number FE5266, with prior knowledge that the Confidential Informant was a prohibited person.

/S/ Russell Johnson, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Dated: December 8, 2022

Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this written affidavit.

Honorable L. Patrick Auld
United States Magistrate Judge
Middle District of North Carolina